Filed 5/12/25  P. v. Solis CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ANDRES MIGUEL SOLIS,<br><br>    Defendant and Appellant. | F086389<br><br>(Super. Ct. No. VCF373191)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Melinda Myrle Reed, Judge.

Sanger Law Firm, Sarah S. Sanger and Robert M. Sanger, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Andres Miguel Solis was convicted of multiple offenses against his former girlfriend, S.M., including assault with intent to commit a rape or oral copulation, forcible oral copulation, and forcible rape.  On appeal, Solis argues that:  (1) the

prosecution committed misconduct by eliciting excluded evidence regarding an incident involving K.K.; (2) the prosecution committed misconduct by eliciting excluded evidence regarding the "cycle of abuse" theory; and (3) defense counsel provided ineffective assistance because she failed to object when the prosecution elicited excluded evidence. The People disagree. We affirm.

## PROCEDURAL HISTORY

On December 20, 2022, the District Attorney of Tulare County filed a first amended information charging Solis with kidnapping to commit oral copulation (Pen. Code,[1] § 209, subd. (b)(1); count 1); forcible rape (§ 261, subd. (a)(2); counts 2, 3); forcible oral copulation (§ 287, subd. (c)(2)(A); counts 4, 5, 6, 7); assault with intent to commit rape or oral copulation (§ 220, subd. (a)(1); count 8); dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1); count 9); injuring a girlfriend (§ 273.5, subd. (a); count 10); and assault with a deadly weapon (§ 245, subd. (a)(1); count 11).

On January 20, 2023, Count 7 was dismissed at the request of the prosecution after the jury filed a note asking the trial court to identify all four instances of oral copulation because the jury could identify only three. That same day, the jury found Solis guilty on counts 2, 3, 4, 5, 6, 8, 9, and 10. As to count 1, the jury found Solis not guilty of kidnapping to commit oral copulation, but guilty of the lesser included offense of false imprisonment by violence. As to count 11, the jury found Solis not guilty of assault with a deadly weapon, but guilty of the lesser included offense of simple assault.

On June 1, 2023, the trial court sentenced Solis to an aggregate term of 22 years, eight months.

On June 6, 2023, Solis timely filed a notice of appeal.

---

[1] Undesignated statutory references are to the Penal Code.

## FACTUAL SUMMARY

**The Prosecution's Case**

Solis and S.M. began "[k]ind of dating" around December 2017, and their relationship became "[o]fficial" in April 2018. At the time, S.M. was 18 years old. They lived together for part of the relationship, in a house owned by Solis's father.

The relationship was "[r]ocky." They fought a lot, and Solis was violent, manipulative, and controlling. On October 25, 2018,[2] they broke up. However, S.M. still loved Solis, would still see him, and they had consensual sexual intercourse.

On November 17, S.M. was with her best friend, and they intended to go to a party. Solis was at a basketball game. He and S.M. argued via phone call and text messages about messages S.M. received from Solis's ex-girlfriend. S.M. also told Solis about another man that she had kissed. Solis asked for this man's address, and he threatened to go to his house and kill him. Solis also threatened to find S.M. at the party and to "shoot[] at the party."

S.M. called the police, and then met with a police officer. The officer told S.M. it would be best if she did not contact Solis. S.M. refrained from talking to Solis for "a little bit," but she repeatedly text messaged him around 1:00 or 2:00 a.m. on November 18. She also repeatedly tried to call him. She still loved him and did not want anything bad to happen to him.

S.M. did not hear from Solis until about 10:00 a.m., when she woke up to a phone call from him. He told her to come to his residence, and she drove over. After she arrived, he came outside and got into her car.

Solis asked S.M. where she had been the prior night, and whether she had gone out. She told him that she did not end up going out. He repeatedly asked to see her

---

[2] References to dates are to dates in 2018 unless stated otherwise.

3.

cellphone.  She told him no.  He pulled S.M.'s hair and told her to give him her phone.  This time she did.

Solis then asked S.M. for her password.  She told him no, and he pulled her hair again.  She then unlocked her cellphone, and he looked to see if she had been talking to other men.  He did not like what he saw, and he repeatedly choked her and pulled her hair.  She told him to stop and started kicking him.  He turned, and she started kicking his back.

Solis told S.M. to stop causing a scene.  He asked her if she wanted him to stab her, picked up scissors that were in her car, and held the scissors to her stomach.  She begged him not to kill her.  He told her to go inside his residence.  She refused.  He then grabbed her wrist and asked her if she wanted him to break it.  She cried and agreed to go inside.

She went inside and ran into the living room.  Solis told her to get on the couch, and she did.  He then strangled her, pushed her down, and told her to get back up.  After that, he repeatedly pulled her up by her hair, pushed her back down, and told her to sit up.

He sat near her and went through her cellphone.  He saw that she was talking to people, and he questioned her about it.  He got mad and started strangling her.

Eventually, he calmed down and asked her to make him a sandwich.  She made him a sandwich while he went through her cellphone and watched television.  After he was done eating, she went to the bathroom to wash piercings she recently had done.  When she got back, he told her that she got the piercings because she wanted attention.

He then pulled her back into the living room and said, "you want to be a slut?  I'm going to f**k you with this drumstick."  He picked up a drumstick and told S.M. to get on the couch and take off her pants.  She eventually complied but asked him not to rape her with the drumstick.

4.

He came towards her with the drumstick, so she curled into a ball and told him she was not going to let him do it. He hit her in the face and told her that she was going to orally copulate him.

She orally copulated him while he went through her phone. Every time he saw that she had "follow[ed]" a man on social media, he hit her in the face. When she cried, he would tell her to stop because she was "not keeping [him] hard."

She told him that she did not want to orally copulate him and that her mouth hurt. He said that he did not care and that she was "his."

At some point, she started screaming for help. He threatened to put tape over her mouth, and a while later, threatened to get a knife and stab her.

He then made her orally copulate him again and took a video of it on her cellphone. While taking the video, he said, "she's busy, bro" into the camera. He sent the video to two men that she knew.

He eventually said, "now go upstairs, and I'm going to f**k you in the a*s." She did not want to have sex with him, but she went upstairs and into his room because she was scared.

He told her to get on the bed and look away from him. She complied. He told her he was putting a condom on because he did not know where she had been. She cried and said that she had only been with him.

He told her to orally copulate him so he could put the condom on. She cried, but she complied. He then put the condom on, told her to lay down, and had sexual intercourse with her while she was crying.

He eventually stopped and told her to orally copulate him again, which she did. Next, he told her to stop and took the condom off. He then told her to get on top of him, and she did. She was still crying. Eventually he told her to get off so he could ejaculate on her chest. She kneeled, and he ejaculated on her.

He told her she could take a shower, and she did.  He got in the shower with her.  After they showered, they talked for a bit.  He repeatedly apologized.  He also told her that he loved her, that they could not be together anymore, and that he was going to turn himself in.  She "wasn't really paying attention to what he was saying."  When he finished talking, they both left.

S.M. told her friend E.S. that Solis had raped her.  E.S. reached out to S.M.'s mom, and S.M.'s mom told S.M. to meet her at the police station.

S.M. was transported to a medical office, where a registered nurse conducted a SART exam.  S.M. had multiple injuries, including bruising on her face, as well as redness on her neck and collarbone area.

Later that evening, S.M. conducted a pretext phone call at a police officer's request.  She called Solis and told him she was going to talk to the police.  He begged her not to and said he was going to kill himself.  She accused him of forcing her to orally copulate him, and he apologized.  She also repeatedly accused him of raping her.  In response, he apologized, begged her not to go to the police, and said he would kill himself.[3]  He also said that he knew what he had done, felt terrible, and would give her money if she did not go to the police.  He also admitted to taking a video and sending it to someone.  He apologized for doing so.

At some point on November 18, Solis posted on social media, " 'Have to accept the consequences for my actions.' "

**Solis's Case**

Solis testified on his own behalf.  According to Solis, his relationship with S.M. became "more serious" in March of 2018.  At the time, he was 19 years old.

---

[3] On one occasion during the pretext call, Solis did specifically deny raping S.M.  She then asserted that he did rape her and force her to orally copulate him, and asked him why he did "all this[.]"  Solis responded, "I went crazy, dude.  I went crazy 'cause I was so hurt."

The relationship eventually ended. However, Solis had never hit or kicked S.M., and they "still hooked up."

A day or two before November 18, Solis got into an argument with S.M. because she told him she went to see an ex-boyfriend. During the argument, he asked her for her ex-boyfriend's address so he could shoot him. He also threatened to kill S.M. However, he did not own or have access to a gun.

Later that night, Solis learned that S.M. had called the police because of his threats. He also received messages and phone calls from her. He did not respond to the messages or answer any of the phone calls.

The next morning, he called her. She told him that she wanted to see him and talk to him. She came to his residence, and when she arrived, he got into her car. At first, they talked. Eventually, he grabbed her arm, pulled her closer, and asked to see her cellphone. He also "kind of [grabbed] her hair in the same grabs." She eventually unlocked her cellphone and gave it to him. He did not pull her hair or threaten to hurt her.

He went through her cellphone, and "found some things that upset [him]." He asked her about those things, and she became upset. She reached for her phone and scratched his face. He told her to stop, and she started punching the steering wheel. He told her to stop again, and she reached for her phone again. She missed and then started punching and kicking his back.

He told her to stop and that she could either go home or go inside his residence. She decided to go inside because she still wanted to talk. He did not grab her by her wrist, choke her, hit her, threaten her, or hold scissors to her stomach.

They went inside and talked. Eventually, she made breakfast for him. After he finished his breakfast, they continued talking. To show him that she was sorry for calling the police on him, she offered to orally copulate him. He accepted.

He asked her if he could take a video of her orally copulating him, she was "okay with it," and he unlocked her phone. As he went to record the video, he saw a message from another man. He recorded a video of her orally copulating him and then sent it to that man.

After he recorded the video, she continued orally copulating him for about five to 10 more minutes. They then went upstairs. He asked her to orally copulate him, and she did. He then put on a condom and they had consensual sexual intercourse. After about 10 to 15 minutes, he took the condom off, and they continued having consensual sexual intercourse.

Afterwards, they showered and talked. He told her that they could not be together. She got upset and started crying. She asked for the reason, and he told her it was because he was talking to someone else. After the conversation, they both left his residence.

Later, he received a call from S.M. During the call, she made accusations against him. He thought she was referring to domestic violence because he had grabbed her in the car. He "wasn't processing anything" and "was very apologetic." By the end of the phone call he had processed what she said, and he denied raping her.

During the call, he offered to give her money if she did not go to the police. However, he never intended to give her money. He just wanted to see her and talk to her.

M.S., Solis's father, testified that S.M. lived at his house from about February through October of 2018. He was not aware of any significant issues in Solis's and S.M.'s relationship, and he "never witnessed anything that would be construed as hostile or violent." He also testified that Solis "is a peaceful person."

A.G., Solis's friend, saw Solis interacting with his girlfriend during part of high school. He never saw Solis use physical force on her. Additionally, in the five or six years A.G. knew Solis, he never heard Solis raise his voice at any woman or get in a physical fight with anybody.

J.S., a friend of Solis since 2016, saw Solis interacting with women, including S.M. J.S. never saw Solis strike or demean any woman. Additionally, J.S. never saw Solis be abusive towards anyone. As to Solis's relationship with S.M., it was "normal." J.S. never saw Solis strike S.M.

K.G. and Solis were good friends. They played basketball together starting when they were approximately six years old, and they played together in high school as well. K.G. was aware of the women Solis was dating or having sexual intercourse with. He never saw Solis be violent or abusive toward anyone. Additionally, he never heard Solis demean, or raise his voice to, S.M.

S.W. met Solis in high school. They started off as friends, and the relationship eventually became sexual. The sexual encounters were always consensual, and S.W. never felt threatened.

Cory Sumpter, a private investigator hired by Solis's family, conducted a video walkthrough of Solis's residence. That video was played for the jury.

H.F. met Solis around Halloween of 2018. They dated for approximately four years, and they were still close after the relationship ended. H.F. never thought that Solis needed to attend anger management classes, and the sexual intercourse was always consensual. H.F. was aware of the charges against Solis, but she never experienced any such behavior towards her.

**The Prosecution's Rebuttal**

Mario Martin, an investigator with the Tulare County District Attorney's Office, interviewed S.W. S.W. told Martin that Solis was forceful during intercourse, that she did not feel like she could say no, and that Solis treated women poorly.[4]

---

[4] According to S.W., Martin manipulated her. Additionally, she "was not 100% honest" with Martin because she wanted "to get him off [her] back."

9.

K.K. went to school with Solis, and they eventually became friends. In the summer of 2013, K.K. was upset with Solis and tried alcohol for the first time. K.K. had Solis pick her up, and he took her back to his mother's house. Solis asked K.K. to get undressed, and she did. She then went into his mother's room and laid back on a chair.

The next thing K.K. remembered is being in a bathtub, still completely undressed. Solis was there, and his "upper half" was undressed. He had slapped her in the face, and he told her she was gagging and not being "useful." K.K. did not consent to having sexual relations with Solis that night.

K.K. kept in contact with Solis, but only because she was informed that there was a video recording of what happened that night and she wanted to find out if that video existed. She was later informed it was another woman in the video, but she never saw the video herself.

E.S. was S.M.'s friend since about third grade. She frequently observed Solis and S.M. interacting. On one occasion, Solis showed S.M. something on his phone. S.M. tried to tap his phone's screen. Solis got mad, hit her hand, and called her stupid.

## DISCUSSION

### I. Solis Forfeited His Claims of Prosecutorial Misconduct

Solis argues that the prosecution committed misconduct by eliciting excluded evidence regarding the incident involving K.K. and the "cycle of abuse" theory. The People argue that Solis forfeited these arguments because defense counsel did not object or request an admonition below. We agree with the People.

#### A. Additional Background

##### i. Evidence Regarding Incident Involving K.K.

The prosecution filed a motion in limine, asking the trial court to admit evidence regarding an incident with K.K. pursuant to Evidence Code sections 1108,

subdivision (a)[5] and 1101, subdivision (b).[6] The alleged incident occurred in the summer of 2013. K.K. was in eighth grade, going into ninth grade. K.K. was approximately 13 years old, and Solis was 14. K.K. was drinking, and she called Solis to pick her up. He picked her up, and they went back to his residence. The next thing she remembered is that she was fully naked, and Solis was standing over her with only his shirt on. After the incident, Solis tried to apologize to K.K.

Solis filed a motion in limine to exclude this evidence.

After reviewing the motions and hearing arguments from the parties, the trial court ruled as follows:

> "The Court disallows the evidence as to [K.K.] regarding the proposed 1108 evidence, finding that it is remote in time, given the alleged victim's age and the defendant's age.

> "Also, under the circumstances described by the parties here, its probative value is outweighed by its prejudicial effect and the undue conception [sic] of time."

After the trial court ruled on this and other issues, the following exchange occurred:

> "[Prosecutor]: And, your Honor, if I may seek clarification?

---

[5] This section states: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1108, subd. (a).)

[6] This section states: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

"Should … defendant take the stand and indicate that he is not violent with women, and he does not force himself on women sexually, would we be able to revisit your rulings?

"[Trial Court]:  Yes.  You can revisit it at that time, depending on the nature of … defendant's testimony.  It may open the door to these other incidents.

"[Defense Counsel]:  Okay.  Well, the reason why, my client and/or others would be in rebuttal.  Clearly, the prosecution is already opening the door with regard to my client's violent character with -- well, my client, and other witnesses would be simply being called in rebuttal to that, to rebut specific acts of violence with his peacefulness [*sic*] character.  I don't know if that's opening the door.

"[Trial Court]:  It is very dependent on the nature of your client's testimony.

"I would think that my ruling would stand even notwithstanding [*sic*] any examination of your client, but the nature of your client's testimony may be such that it does, indeed, open the door.  Normally, it wouldn't.

"I don't intend to have it open the door just because defendant indicates that these incidents with the complaining witness didn't happen, the charged complaining witness or perhaps the others.  I see it narrow.  But again, depending on the nature of the testimony, it could affect the inclusion of those other incidents."

At trial, Solis testified on his own behalf.  While cross-examining him, the prosecution asked him if he knew who K.K. was.  Solis stated that he did.  The prosecution went on to ask Solis about his relationship with K.K.  Solis admitted that he had a sexual relationship with her, but he denied sexually assaulting her.

While defense counsel made a hearsay objection during this questioning, she did not object based on the trial court's prior ruling.  On redirect, she asked Solis additional questions about his relationship with K.K.

12.

During the prosecution's rebuttal, the prosecutor called K.K. as a witness to testify regarding the incident that occurred in the summer of 2013.[7]

### ii. Evidence Regarding the "Cycle of Abuse" Theory

During the prosecution's case in chief, the prosecution indicated that it wanted to call Detective Mario Martin, who worked in the violence against women division, and ask: "is it, in your training and experience, common for domestic violence victims to turn back to a perpetrator?" The prosecution also wanted to ask "if there is a common pattern among [*sic*] an incident, then an apology, then reconciliation."

Defense counsel objected. According to defense counsel, "[t]here is a technical area of psychology called the cycle of violence," and domestic violence experts are "routinely subpoenaed to testify" regarding "the makeup/breakup cycle with domestic violence."

The trial court and the prosecution then had the following exchange:

"[Trial Court]: I tend to agree [with defense counsel]. I am aware of domestic violence syndrome and testimony as it relates to that expertise. And just being a detective for 20 years or so in the Violent Crimes Unit is not sufficient to lay a psychological opinion in that regard. So unless he has formal training in the syndrome, I would not be inclined to allow the testimony.

"[The Prosecution]: Your Honor, there is a specific case law [*sic*], if the Court will give me a minute to pick it up. I'm not asking him about any syndrome specifically. There is case law specifically that says that domestic violence detectives that have been in the domestic violence field, can testify that in their experience, victims of domestic violence return to their perpetrator.

"[Trial Court]: You haven't brought that up before. I'm disinclined for now. I'll only say perhaps for rebuttal, if she presents proper authority, it may be permitted.

---

[7] A summary of K.K.'s testimony is included in the Factual Summary, *ante*.

"[The Prosecution]: Your Honor, [defense counsel] made a big deal or points about [S.M.] returning …. Mr. Martin, I informed Court and counsel, is not available to testify next week. He's only available this week.

"[Trial Court]: There are many domestic violence detectives. If you are saying it is something in the realm of just being a detective and you have case law to support that, you may have to present somebody else. This should have been brought up as a motion in limine. And now making the jury wait for something that should have been brought up at a hearing before -- again, the Court is not aware of any authority that allows detectives to testify to the psychological effect of returning to perpetrators. I'm only saying defense is not aware of the authority. The Court is not aware of the authority. And defense has objected. It may be proper rebuttal."

During Solis's case, defense counsel called Cory Sumpter, a private investigator with over 30 years of law enforcement experience, to testify. When the prosecution cross-examined Sumpter, the following exchange occurred:

**"Q. And there is a term called cycle of abuse, correct?**

"A. Yes.

**"Q. What is that?**

"A. One of the things that, like, frequently happens, a person can be a multiple victim of abuse by the same abuser."

At this point defense counsel objected, arguing that foundation had not been laid for expert testimony. The trial court sustained the objection, and the prosecution continued cross-examining Sumpter:

**"Q. During your 40-year career, you said you've investigated domestic violence cases.**

**How many would you say you have investigated?**

"A. Probably well over 100.

**"Q. And did you receive any specific training on domestic violence cases?**

14.

"A. Not specifically on domestic violence ….

**"Q. And when you were a sexual assault detective, did you receive trainings in being a sexual assault detective?**

"A. Not specifically. It [*sic*] wasn't specifically a sexual assault detective. I was assigned to the violent crimes as an agent, which is a supervising agent in that position, so I would handle kind of the overflow on a lot of different cases. It could be sexual assault cases. It could be domestic violence cases. It could be homicide cases.

**"Q. Did you receive training specifically to do that?**

"A. Not specifically to the sexual assault.

I had been to a homicide investigator's course. I've been to an officer-involved shooting course.

**"Q. Both of those courses touched on domestic violence, correct?**

"A. To a point. Just not specifically, but, you know, to a point.

**"Q. Okay. And throughout your investigations, you said yourself that you have had domestic violence victims repeated; is that correct?**

"A. Yes.

**"Q. The same victim over and over?**

"A. Sometimes, yes.

**"Q. That's fairly common?**

"A. Yes …."

## B. *Applicable Law*

" ' "The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's … intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is

15.

prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Stanley* (2006) 39 Cal.4th 913, 951.)

"[I]t is misconduct to elicit or attempt to elicit inadmissible evidence in violation of a court ruling[.]" (*People v. Silva* (2001) 25 Cal.4th 345, 373 (*Silva*).) Such a claim "requires proof that the prosecutor acted deliberately or intentionally." (*People v. Molano* (2019) 7 Cal.5th 620, 675.)

" 'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition[.]' " (*Silva*, *supra,* 25 Cal.4th at p. 373.) Failure to do so "is excused only when 'an objection would have been futile or an admonition ineffective.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 679.)

### C. Analysis

Defense counsel neither objected nor requested an admonition when the prosecution elicited evidence regarding the incident involving K.K and the "cycle of abuse" theory. However, Solis argues that these failures are excused.

As to evidence regarding the incident involving K.K., Solis argues that if defense counsel had objected when the prosecution first mentioned K.K.'s name in front of the jury, it "would have made the jury believe [he] was trying to hide something that was probative – when it was not." However, Solis does not explain, nor do we see, how the mere mention of K.K.'s name was so prejudicial that any potential prejudice could not have been cured by an admonition. (*People v. Allen* (1978) 77 Cal.App.3d 924, 935 (*Allen*) ["It is only in the exceptional case that 'the improper subject matter is of such a character that its effect … cannot be removed by the court's admonitions.' "].) Solis also argues that an objection would have been futile. However, given that the trial court

previously ruled in his favor and excluded the evidence, the record does not support this argument.[8]

As to the "cycle of abuse" evidence, Solis argues that an admonition would not have been effective. However, had defense counsel timely objected on the basis of prosecutorial misconduct, the jury would have simply heard the term "cycle of abuse" (and possibly a brief description). Solis does not explain, nor do we see, how the mention of this term and a brief description could be so prejudicial that it could not have been cured by an admonition. (*Allen*, *supra*, 77 Cal.App.3d at p. 935.)

Finally, Solis argues that the prosecution's repeated willful misconduct "cannot be excused by the defense failure to object in front of the jury." However, there is nothing in the record suggesting that the prosecution intentionally (as opposed to inadvertently) violated the trial court's orders. Notably, the trial lasted over a week, there were numerous witnesses, the prosecution complied with the orders during its case-in-chief, and the trial court specifically left open the possibility that the evidence would be admissible on rebuttal. Moreover, while defense counsel made objections, she did not once object on the basis of prosecutorial misconduct.

As defense counsel did not object to the alleged misconduct or request an admonition, and as this failure is not otherwise excused, Solis's claims of prosecutorial misconduct were not preserved for appeal. (*Silva*, *supra*, 25 Cal.4th at p. 373.) [" 'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition[.]' "].)

---

[8] As discussed *post*, the record suggests that the trial court may have changed its ruling. If so, an objection based on prosecutorial misconduct would have been futile, but only because there was no misconduct.

17.

## II. Solis's Ineffective Assistance of Counsel Claim Fails

### A. *Applicable Law*

Solis has the burden of proving ineffective assistance of counsel. (*People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.) To establish such a claim, he must show (1) his counsel's performance fell below an objective standard of reasonableness and (2) prejudice, that is, but for counsel's unprofessional error a different result would have been reasonably probable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.) "Because of the difficulties inherent in making the evaluation [of counsel's performance], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Id*. at p. 689.)

"It is … particularly difficult to establish ineffective assistance of counsel on direct appeal, where we are limited to evaluating the appellate record. If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) Reversal is permitted " 'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' " (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.)

### B. Analysis

#### i. Solis Fails to show that Defense Counsel's Performance Fell Below an Objective Standard of Reasonableness

Solis argues that defense counsel should have objected when the prosecution attempted to elicit testimony regarding the incident with K.K. and testimony regarding the "cycle of abuse," both of which violated a court order. These arguments fail on direct appeal because there is a satisfactory explanation for defense counsel's failure to object.

As to the evidence regarding the incident involving K.K., based on the record in this case, it appears that the trial court may have revised its ruling. As summarized above, the trial court left open the possibility of allowing K.K.'s testimony if Solis opened the door. The prosecution then followed the trial court's order during its case-in-chief, and did not call or mention K.K. It was not until after Solis called character witnesses and testified himself that the prosecution asked Solis about K.K. Moreover, the trial court repeatedly held conferences off the record, including one right before defense counsel began cross-examining Solis. Finally, as pointed out by the People, "all of the parties proceeded as if [Solis] had opened the door to allow this evidence." As the trial court may have revised its ruling off the record to allow evidence regarding the incident involving K.K., we cannot say, on this direct appeal, that defense counsel was ineffective for failing to object based on prosecutorial misconduct. (*People v. Diaz* (1992) 3 Cal.4th 495, 562 [failing to object to admissible evidence does not constitute ineffective assistance of counsel because an objection would be futile].)

As to evidence regarding the "cycle of abuse" theory, there is at least one rational tactical purpose defense counsel may have had in deciding not to object. While the trial court did not allow the prosecution to present the evidence during its case-in-chief, the trial court left open the possibility that the evidence would be allowed on rebuttal. Given this ruling, defense counsel may have allowed the prosecution to ask her witness questions related to the "cycle of abuse" theory in an attempt to avoid having the

19.

prosecution call a "better" witness on rebuttal. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502 ["deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance"].)

Accordingly, Solis fails to show that defense counsel's performance fell below an objective standard of reasonableness, and his claims of ineffective assistance of counsel fail.

### ii.    *Solis Did Not Suffer Prejudice*

Moreover, even if defense counsel erred by failing to object when the prosecution elicited evidence regarding the incident involving K.K. and the "cycle of abuse" theory, Solis did not suffer prejudice.

In arguing prejudice, Solis relies on the fact that the prosecution "seized upon" the evidence during closing. He also relies on the mixed verdict, which he argues shows that the jury only selectively believed the evidence.

Solis is correct that the mixed verdict shows that the jury only selectively believed the evidence,[9] and this could support a finding of prejudice. However, in this case, the evidence supporting the offenses on which Solis was convicted is strong. S.M. testified that he repeatedly pulled her hair, choked her, threatened her, hit her, and sexually assaulted her.

There is also evidence corroborating S.M.'s version of events regarding the sexual assault and physical abuse. On the day of the incident, S.M. conducted a pretext phone call. As discussed above, S.M. repeatedly accused Solis of sexually assaulting her, and in response Solis apologized, begged her not to go to the police, and said he would kill himself. And while on one occasion Solis did specifically deny raping S.M., S.M.

---

[9] For example, Solis was found not guilty of assault with a deadly weapon, and the deadly weapon enhancement attached to count 8 was found not true.

pressed him, asking him why he did "all this[.]" Solis responded, "I went crazy, dude. I went crazy 'cause I was so hurt."

Finally, the jury was shown photographs of S.M.'s injuries. The photographs showed multiple injuries, including bruising on her face, as well as redness on her neck and collarbone area.

In addition to there being strong evidence in support of the convictions, K.K. was not the only witness who testified that she was previously sexually assaulted by Solis. Moreover, the "cycle of abuse" testimony was minimal and did not include any hypotheticals related to the facts of this case.

Accordingly, even if defense counsel had objected and the evidence had been excluded, it is not reasonably probably there would have been a different result.

## DISPOSITION

The judgment is affirmed.

FAIN, J.*

WE CONCUR:


HILL, P. J.


FRANSON, J.

---

* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.